# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JOYCE A. MCKNIGHT,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06cv00046 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,**[1] | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Joyce A. McKnight, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

---

[1]Michael J. Astrue became Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McKnight protectively filed her application for DIB on March 22, 2004, alleging disability as of February 13, 2004, based on anxiety, depression and back and leg pain. (Record, ("R."), at 61-64, 71, 94.) The claim was denied initially and upon reconsideration. (R. at 48-50, 53, 54-56.) McKnight then requested a hearing before an administrative law judge, ("ALJ"). (R. at 57.) The ALJ held a hearing on July 19, 2005, at which McKnight was represented by counsel. (R. at 25-45.)

By decision dated August 31, 2005, the ALJ denied McKnight's claim. (R. at 18-22.) The ALJ found that McKnight met the disability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 21.) The ALJ found that McKnight had not engaged in substantial gainful activity since February 13, 2004. (R. at 21.) At one point, the ALJ also found that the medical evidence established that McKnight suffered from mild depression, but that she did not suffer from either a severe physical or a severe mental impairment. (R. at 19-21.) Despite the ALJ's finding that McKnight did not suffer from a severe impairment, he proceeded, nonetheless, to analyze McKnight's residual functional capacity and whether jobs existed in significant numbers in the national economy that she could

Case 2:06-cv-00046-JPJ-PMS   Document 14   Filed 05/30/07   Page 2 of 17   Pageid#: 71

perform.[2] Later in his decision, the ALJ found that McKnight's mental residual functional capacity was limited in that she could not perform highly-skilled, high-stress jobs or work with the public. Therefore, despite the ALJ's contradictory findings, it appears he necessarily found that McKnight suffered from a severe mental impairment. The ALJ found that McKnight's allegations regarding her pain and symptoms were not totally credible. (R. at 21.) The ALJ found that McKnight had no exertional limitations. (R. at 21.) Thus, the ALJ concluded that McKnight could not perform her past relevant work. (R. at 22.) Based on McKnight's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that McKnight could perform, including those of a mail sorter, a dishwasher, a hand packer, a cleaner, a food preparation worker, a nonconstruction laborer and a machine operator. (R. at 22.) Thus, the ALJ concluded that McKnight was not disabled under the Act and was not eligible for DIB benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued his decision, McKnight pursued her administrative appeals, (R. at 14), but the Appeals Council denied her request for review. (R. at 5-9.) McKnight then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2006). The case is before this court on McKnight's motion for summary judgment

---

[2]He was not required to proceed with this analysis under 20 C.F.R. § 404.1520(a), which provides that if the Commissioner finds conclusively that a claimant is or is not disabled at any point in the five-step process in evaluating DIB claims, review does not proceed to the next step. Whether a claimant has a severe impairment is only the second step in the five-step process while the determination of whether a claimant can perform other work is the last step. *See* 20 C.F.R. § 404.1520 (2006).

-3-

filed December 29, 2006, and the Commissioner's motion for summary judgment filed January 29, 2007.

## *II. Facts*

McKnight was born in 1956, (R. at 28, 61), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. § 404.1563(c). McKnight obtained her general equivalency development, ("GED"), diploma and has past relevant work experience as the owner and operator of a convenience store. (R. at 28-29.) McKnight testified at her hearing that she quit her job because she had a "hard time dealing with people in general." (R. at 31.) She stated that she experienced back and leg pain. (R. at 33.) McKnight stated that she could walk for up to 40 minutes without interruption. (R. at 34.) She stated that she could lift and carry her granddaughter, who weighed 17 pounds, for up to 10 minutes without interruption. (R. at 34.) She stated that she could sleep 17 hours a day. (R. at 35.)

Cathy Sanders, a vocational expert, also was present and testified at McKnight's hearing. (R. at 42-44.) Sanders testified that McKnight's work as a store manager was medium[3] and skilled. (R. at 43.) Sanders was asked to consider a hypothetical individual of McKnight's age, education and work history, who had no exertional limitations and who could perform only simple, low-stress jobs that did not require her to regularly interact with the general public. (R. at 43.) Sanders testified

---

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2006).

Case 2:06-cv-00046-JPJ-PMS   Document 14   Filed 05/30/07   Page 4 of 17   Pageid#: 73

that such an individual could perform medium and light[4] jobs, such as a cleaner, miscellaneous food preparation jobs, a nonconstruction laborer, a labeler, a gluer, a machine operator, a hand packager, a nonpostal mail sorter, an administrative assistant and a dishwasher. (R. at 43.) Sanders testified that an individual with the limitations set forth in psychologist Lanthorn's assessment would not be able to work. (R. at 44, 172-74.) Sanders testified that an individual who was limited as set forth in Dr. Fleenor's assessment could not perform any jobs. (R. at 44, 200-01.)

In rendering his decision, the ALJ reviewed records from Stone Mountain Health Services; Lee Regional Medical Center; Kaye Weitzman, L.C.S.W.; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. F. Joseph Duckwall, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Lawrence J. Fleenor, M.D.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Donna Abbott, M.A., a licensed senior psychological examiner; Lee County Schools; and Virginia Department of Education. McKnight's attorney submitted additional medical records from Dr. Fleenor to the Appeals Council.[5]

School records show that in 1969 McKnight obtained a verbal IQ score of 100, a performance IQ score of 93 and a full-scale IQ score of 97. (R. at 180.)

---

[4]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2006).

[5]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Case 2:06-cv-00046-JPJ-PMS   Document 14   Filed 05/30/07   Page 5 of 17   Pageid#: 74

On July 15, 1991, Dr. Lawrence J. Fleenor, M.D., saw McKnight for complaints of compulsive eating. (R. at 194.) In February 1996, McKnight complained of "nerves, depress[ion] and not sleeping good." (R. at 191.) She reported family stress. (R. at 191.) In September 1996, McKnight reported depression and that she was sleeping a lot. (R. at 190.) On September 5, 1997, McKnight complained of problems with her "nerves." (R. at 189.) She reported insomnia and anorexia. (R. at 189.) McKnight's husband described her as a perfectionist, who became angry, depressed and paranoid if she could not stay on top of everything. (R. at 189.) He also reported that McKnight was a compulsive telephone pole counter. (R. at 189.) Dr. Fleenor diagnosed obsessive compulsive disorder and depression. (R. at 189.) He prescribed Paxil. (R. at 189.) On September 18, 1997, McKnight reported that she was feeling better. (R. at 188.) In October 1997, McKnight reported that her depression was "doing good." (R. at 187.) Dr. Fleenor diagnosed obsessive compulsive disorder and prolactin secondary to a tumor.[6] (R. at 187.)

On August 10, 2004, Dr. Fleenor saw McKnight for complaints of low back pain. (R. at 163.) Dr. Fleenor reported that McKnight appeared uncomfortable and irritable. (R. at 163.) Dr. Fleenor diagnosed depression and low back syndrome. (R. at 163.) On September 10, 2004, McKnight complained of breaking out in hives when she became anxious. (R. at 162.) Dr. Fleenor noted that McKnight had a few scarred lesions. (R. at 162.) He prescribed Librium. (R. at 162.) On September 18, 2004,

---

[6]Prolactin is one of the hormones secreted by special cells of the anterior pituitary gland that stimulates and sustains lactation in pospartum mammals. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1362 (27th ed. 1988). McKnight suffered from a pituitary tumor when she was 19 years old. (R. at 187.) She reported that she had done well since. (R. at 187.) An MRI of McKnight's brain performed in 2002 showed no significant abnormalities. (R. at 120-21.)

Case 2:06-cv-00046-JPJ-PMS   Document 14   Filed 05/30/07   Page 6 of 17   Pageid#: 75

McKnight reported that she was "doing much better," noting that the Librium had helped. (R. at 161.) Dr. Fleenor reported that McKnight was "fidgeting" and biting her nails. (R. at 161.) On November 26, 2004, McKnight reported that she was dysfunctional and could not cope. (R. at 185.) McKnight admitted that she had missed taking her medication all along. (R. at 185.) Dr. Fleenor reported that McKnight was depressed, anxious and "hateful." (R. at 185.) On December 27, 2004, McKnight reported that medications helped her symptoms of anxiety and depression. (R. at 184.) On January 26, 2005, McKnight reported that she was moody, irritable, aggravated and felt like she was going crazy. (R. at 183.) On April 1, 2005, McKnight reported that she was doing better with her symptoms of anxiety and depression. (R. at 197.)

On June 15, 2005, Dr. Fleenor completed a mental assessment indicating that McKnight had a satisfactory ability to maintain personal appearance. (R. at 200-01.) He indicated that McKnight had a seriously limited, but not precluded, ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to maintain attention/concentration and to understand, remember and carry out complex, detailed and simple instructions. (R. at 200-01.) He indicated that McKnight had no useful ability to deal with work stresses and to function independently. (R. at 200-01.) Dr. Fleenor indicated that McKnight had both a seriously limited, but not precluded, ability, as well as no useful ability to relate predictably in social situations. (R. at 201.) He failed to indicate whether McKnight was limited and, if so, to what extent, in her ability to demonstrate reliability. (R. at 201.) This appears simply to be an error on Dr. Fleenor's part. However, from Dr. Fleenor's assessment it is clear that she had no better than a seriously limited, but not

precluded, ability in these areas.

On March 6, 2003, McKnight saw Rita Brown, F.N.P., for complaints of low energy, decreased libido and stressors. (R. at 115.) Brown reported that McKnight did not appear to be in any acute distress and that she was calm. (R. at 115.) Brown diagnosed depression and anxiety. (R. at 115.) McKnight was prescribed Wellbutrin and BusSpar. (R. at 115.) On March 21, 2003, McKnight reported less depressive symptoms since starting medication. (R. at 114.) She continued to complain of low energy levels, which caused her to want to sleep all of the time. (R. at 114.) Brown discontinued Wellbutrin and BuSpar and prescribed Zoloft. (R. at 114.) On May 8, 2003, McKnight reported that she was not taking her Zoloft because she was "very anxious about taking any medication." (R. at 113.) McKnight reported that she was stable. (R. at 113.) On March 18, 2004, McKnight complained of anxiety, back pain and chest pain. (R. at 108.) McKnight reported that she had stopped taking Zoloft and BuSpar. (R. at 108.) She reported having a lot of stressors at home with her family. (R. at 108.) X-rays of McKnight's lumbar spine showed mild degenerative changes. (R. at 119.) Brown diagnosed vague past episode of chest pain, continued tobacco dependence, anxiety and mild depression. (R. at 107.) On April 2, 2004, McKnight reported improvement with Zoloft. (R. at 106.) McKnight reported that she still had a lot of crying episodes and occasionally became easily agitated. (R. at 106.) She also reported decreased libido. (R. at 106.) Brown diagnosed depression, probable mild anxiety, gastroesphageal reflux disease, ("GERD"), and back pain with poor intolerance to Vioxx. (R. at 105.) On May 13, 2004, McKnight reported that she was doing much better and that she was less anxious. (R. at 104.) On January 11, 2005, McKnight reported that "there ha[d] been some benefit with Lexapro." (R. at 181.)

-8-

On April 23, 2004, Kaye Weitzman, L.C.S.W., saw McKnight for her complaints of "bad nerves" and depression. (R. at 134.) Weitzman reported that McKnight's mood was anxious and depressed. (R. at 135.) Weitzman diagnosed panic disorder with agoraphobia, major depressive disorder, recurrent, moderate, obsessive-compulsive disorder and to rule out bipolar II disorder. (R. at 135.) Weitzman indicated that McKnight had a then-current Global Assessment of Functioning, ("GAF"),[7] score of 50,[8] with a past GAF score of 85.[9] (R. at 135.)

On June 24, 2004, Dr. Michael J. Hartman, M.D., a state agency physician, indicated that McKnight had the residual functional capacity to perform medium work. (R. at 137-46.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 140-42.) This assessment was affirmed by Dr. F. Joseph Duckwall, M.D., another state agency physician, on October 18, 2004. (R. at 144.)

On June 28, 2004, Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that McKnight had a nonsevere affective disorder and anxiety-related disorder. (R. at 147-60.) Tenison

---

[7]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8]A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

[9]A GAF of 81-90 indicates "[a]bsent or minimal symptoms . . ., good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns ...." DSM-IV at 32.

reported that there were no limitations on McKnight's ability to perform activities of daily living or to maintain social functioning. (R. at 157.) He reported that McKnight had a mild limitation in her ability to maintain concentration, persistence or pace and that she had not experienced any episodes of decompensation. (R. at 157.) This assessment was affirmed by Eugenie Hamilton, Ph.D., another state agency psychologist, on October 18, 2004. (R. at 147.)

On January 31, 2005, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, and Donna Abbott, M.A., a licensed senior psychological examiner, evaluated McKnight at the request of Disability Determination Services. (R. at 164-71.) Lanthorn and Abbott reported that McKnight was able to attend and concentrate. (R. at 166.) McKnight could follow directions. (R. at 166.) Lanthorn and Abbott reported that significant signs of depression were not observed. (R. at 166.) Lanthorn and Abbott reported that McKnight's symptoms were suggestive of mild anxiety. (R. at 166.) Lanthorn and Abbott diagnosed generalized anxiety disorder, mild, and they assessed McKnight's then-current GAF score at 65.[10] (R. at 169.)

Abbott completed a mental assessment indicating that McKnight had a more than satisfactory ability to follow work rules, to use judgment and to maintain personal appearance. (R. at 172-74.) Abbott indicated that McKnight had a satisfactory ability to relate to co-workers, to interact with supervisors, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed and simple instructions, to behave in an emotionally stable manner and

---

[10]A GAF of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

to relate predictably in social situations. (R. at 172-73.) She also indicated that McKnight had a seriously limited, but not precluded, ability to deal with the public, to deal with work stresses, to understand, remember and carry out complex instructions and to demonstrate reliability. (R. at 172-73.)

## *III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-11-

By decision dated August 31, 2005, the ALJ denied McKnight's claim. (R. at 18-22.) The ALJ found that the medical evidence established that McKnight suffered from mild depression, but that she did not suffer from either a severe physical or a severe mental impairment. (R. at 19-21.) Despite the ALJ's finding that McKnight did not suffer from a severe impairment, he proceeded to analyze McKnight's residual functional capacity and whether jobs existed in significant numbers in the national economy that she could perform. Later in his decision, the ALJ found that McKnight's residual functional capacity was limited in that she could not perform highly-skilled, high-stress jobs or work with the public. Therefore, despite the ALJ's contradictory findings, it appears he necessarily found that McKnight suffered from a severe mental impairment. The ALJ found that McKnight had no exertional limitations. (R. at 21.) Thus, the ALJ concluded that McKnight could not perform her past relevant work. (R. at 22.) Based on McKnight's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that McKnight could perform, including those of a mail sorter, a dishwasher, a hand packer, a cleaner, a food preparation worker, a nonconstruction laborer and a machine operator. (R. at 22.) Thus, the ALJ concluded that McKnight was not disabled under the Act and was not eligible for DIB benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(g) (2006).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial

-12-

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

McKnight argues that the ALJ's decision is not supported by substantial evidence. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 9.) In particular, McKnight argues that the ALJ erred by rejecting the opinions of Dr. Fleenor, Abbott and Lanthorn. (Plaintiff's Brief at 9-15.) McKnight further argues that the ALJ rejected Dr. Fleenor's opinion without giving proper explanation as to why he did so. (Plaintiff's Brief at 11-12.) McKnight also argues that the ALJ erred by rejecting the assessment of the state agency physician, who found that she was physically limited to medium work. (Plaintiff's Brief at 15-17.)

The ALJ found that McKnight had the residual functional capacity to perform

-13-

work except for highly-skilled, high-stress jobs that required her to work with the public. (R. at 21.) McKnight argues that the ALJ erred by failing to give controlling weight to the opinions of Dr. Fleenor, Abbott and Lanthorn. (Plaintiff's Brief at 9-15.) Under 20 C.F.R. § 404.1527(d), the ALJ must give controlling weight to a treating source's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. The ALJ gave little weight to the assessments of Dr. Fleenor because they were not supported by his own medical findings and because they were inconsistent with the record as a whole. (R. at 21.) Based on my review of the record, I find that substantial evidence exists to support this finding. The record shows that McKnight has been treated for anxiety and depression since 1996. (R. at 191.) The record also shows that McKnight's symptoms were described as "mild." (R. at 105, 107, 166.) Treatment notes showed that McKnight was alert and oriented, that her affect and thought processes were normal and that her judgment and insight were fair. (R. at 104, 106, 108, 110, 112-13, 115, 135, 181.) The record further shows that when McKnight was compliant with medication, her symptoms improved. (R. at 104, 106, 114, 161, 181, 184,187-88, 197.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Lanthorn and Abbott diagnosed a mild generalized anxiety disorder, which was reflected by symptoms that suggested merely mild anxiety. (R. at 166, 169.) Lanthorn assessed McKnight's GAF score at 65, which is reflective of mild symptoms or some difficulty in social, occupational or school functioning. (R. at 169.) Lanthorn reported that McKnight's symptoms should be amenable to treatment. (R. at 170-71.) Lanthorn noted that an increase in stress may increase McKnight's anxiety level and that an

Case 2:06-cv-00046-JPJ-PMS   Document 14   Filed 05/30/07   Page 14 of 17   Pageid#: 83

increase in her anxiety level may be manifested by irritability around other people. (R. at 170.) The ALJ accommodated this when he limited McKnight to low-stress jobs that did not involve interaction with the public. (R. at 20-21.) The ALJ noted that he was rejecting the assessment of Dr. Fleenor because it was not supported by the evidence of record. (R. at 21.) The ALJ gave greater weight to the report of Lanthorn and Abbott. (R. at 21.) Based on my review of the evidence, I find that substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Fleenor's assessment. I also find that the opinions of Lanthorn and Abbott and the state agency psychologists support the ALJ's finding.

McKnight also argues that the ALJ erred by rejecting the assessment of the state agency physician, who found that she was physically limited to medium work. (Plaintiff's Brief at 15-16.) The ALJ found that McKnight had no severe physical impairment. (R. at 21.) Based on my review of the record, I find that substantial evidence exists to support this finding. X-rays of McKnight's lumbar spine showed mild degenerative changes. (R. at 119.) An MRI of McKnight's brain showed no significant abnormalities. (R. at 120-21.) Other than the state agency physicians, no other medical care provider has placed any limitations on McKnight's physical work-related abilities. Even if McKnight was limited to performing medium work, the jobs identified by the vocational expert were medium and light jobs. (R. at 43.) Thus, I find that substantial evidence exists to support the ALJ's finding that there are jobs available in significant numbers in the national economy that McKnight can perform.

For all of these reasons, I find that substantial evidence exists to support the ALJ's rejection of Dr. Fleenor's assessment and that substantial evidence exists to support the ALJ's finding that McKnight did not suffer from a severe physical

impairment.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists to support the ALJ's finding that McKnight did not have a severe physical impairment;

2.  Substantial evidence exists to support the ALJ's finding regarding McKnight's mental residual functional capacity;

3.  Substantial evidence exists to support the ALJ's finding that there were a significant number of jobs that existed in the national economy that McKnight could perform; and

4.  Substantial evidence exists to support the ALJ's finding that McKnight was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny McKnight's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006):

Within ten days after being served with a copy [of

-16-

this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 30th day of May 2007.

/s/     *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE